HERMAN SHOLK and JOSEPH WEISSMAN, complainants-respondents,

*v.*

JACOB CAYER, defendant-appellant.

[Submitted February term, 1933. Decided April 28th, 1933.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Backes, who delivered the following opinion orally:

"The court: In February, 1930, Cohn, a friend of the complainants and the defendant, was pressed for money and to help him the three endorsed his $5,000 note, which was discounted in the Orange Trust Company, and his $10,000 note, which was discounted in the First National Bank of Orange. The notes fell due in June, and were renewed. They were again renewed in October. Cohn then went bankrupt, and when the notes fell due in February, 1931, the four became joint makers on renewal notes. At that time, or was it at one of the previous renewal periods, the three, other than Cohn, contributed $500 apiece and reduced the $5,000 note. In February, 1931, the $3,500 note and the $10,000 note were renewed for two months. When they fell due in April, 1931,

they were not attended to. Later, the three, the complainants and the defendant, in June, 1931, each paid his share, one-third of the $3,500 note held by the Orange Trust Company, and one-third of the $10,000 note in the First National Bank of Orange. Now to go back.

"When the notes fell due in June, 1930, Cayer balked at renewal. He wanted, or pretended to want to take his loss then and be done with it. The complainants could not conveniently raise their share, and to prevail upon him to continue endorsing, they agreed to indemnify him and on his part he agreed to endorse as long as the banks would renew. The agreement was reduced to writing and they gave their notes, to his order, each for $2,500, which were placed with an attorney in escrow, to be delivered upon their default. After the three paid their shares of the last two notes, those that fell due in June, 1931, the defendant represented to the lawyer that there had been a default and demanded the two notes he held in escrow. He surrendered them, and the defendant sued on them in the law court. The complainants then filed this bill to restrain the action at law and to compel the surrender of the notes, setting up that they were obtained from the escrow in fraud of the defendant's later agreement, when the last renewals fell due in June, 1931, that if they would pay their shares of the notes and relieve him from his agreement to endorse so long as the banks would renew,· he would release them of their agreement to indemnify him.

"When the three endorsed for Cohn it was understood to be a joint liability, although, necessarily, the endorsements were rotational, Cayer's being last. I think the other proof to that effect is fortified by Cayer's insistence that he be indemnified against liability on future renewal when the notes first fell due, because Sholk and Weissman being prior endorsers there would be no need for indemnity if their agreement had not been one of joint liability. If it had been a rotational liability, the notes alone would be his indemnity. He could have called upon Cohn, the maker, and Sholk and Weissman, in their order, and recovered.

"Cayer insists that he refused to endorse the notes in the

first instance, unless he be secured and that Weissman agreed to give him a note as security and having failed up until the time the notes matured in June, 1930, he abruptly refused to renew until Weissman made good. I don't believe that story. This is what happened: When the notes fell due in June (1930), and with the joint liability facing him to the extent of $5,000—because, I think, it was the arrangement of the three, to help out Cohn, each to the extent of $5,000—Cayer saw his opportunity to escape by refusing to again endorse and he applied the strangle hold knowing or feeling that his two associates were not in position to pay up, and they were not. He had them in a fix, it spelled bankruptcy for them if he persisted, and to get out of it they agreed to indemnify him if he would go along. Steinback, the lawyer who drew the indemnity agreement and was the escrow of the notes, gives satisfactory testimony that when the indemnity was demanded, to all appearances there had been no previous arrangement of indemnity; that Cayer simply refused to endorse unless he was indemnified, that the demand appeared too spontaneous, and that nothing occurred or was said by Cayer indicating that there had been a prior arrangement, or that the refusal to endorse was because of Weissman's failure to give indemnity, as Cayer claims he agreed to when the notes were first endorsed. I think, in an answer to my question as to whether there was anything to indicate a prearrangement, he said, 'No. It came out at that time,' as if it were an original thought and an opportunity.

"When the joint notes of February, 1931, for two months fell due, or were about to fall due, Cayer said in substance to the complainants, 'I will not renew although I agreed to. My line of credit at the banks is impaired to the extent of $13,500. The notes stand against my line of credit, and I will not go on any further,' and, being reminded of his contract to endorse as long as the banks would take care of the notes, he said to them, 'forget the indemnity. Let us all be sports and pay our share, and quit.' And they did. They had two or three meetings in a restaurant where they were in the habit of meeting and his proposition was the topic.

"Cayer's agreement with the complainants was not an accidental expression, it was repeated at the two or three meetings: 'I will not endorse. Forget the indemnity agreement. Let us all be sports and pay our share.' What was the significance? Were these not words of contract when acted upon, words that meant that the indemnity agreement would be at an end if the complainants would then pay their shares of the notes and release Cayer from his agreement to renew? The banks were not insisting upon payment. There is no testimony to the contrary as to the First National Bank. A clerk in the Orange Trust Company gave testimony that the bank called for liquidation. It was after the notes were due, after they were frozen, were not taken care of, that the trust company insisted upon liquidation of its note. There was no refusal to renew. It wanted the note paid or revived, made liquid. The terms of the agreement upon which the indemnity was to be surrendered were performed. Each went to his own bank, raised his share and the notes were paid off.

"Now, Cayer denies the arrangement. But if it had not been that each should take his original loss under Cayer's urge, 'let's all be sports. Forget the indemnity,' and if Cayer was then minded that the indemnity agreement prevailed, would he not have said at that time, 'you are not doing according to your indemnity agreement; you are each paying only a third. It is your place to pay one-half and let me off.' There was nothing of that kind. Like the two complainants he went to his bank, raised one-third of the money, paid his share and made no demand of them, then or later, for reimbursement, except by the suit at law. Asked on the witness stand why he did not insist on the complainants paying the whole debt or why before the suit he did not ask for reimbursement, he gave some lame reason that he was afraid, or something of that kind. His affidavit on the motion for a preliminary restraint is a flat contradiction. There he said he repeatedly made demands and was refused, and that then he directed his lawyer to sue.

"Then we have this situation, and it is plain: In June, 1930, the defendant forced the complainants into an agree-

ment to indemnify him by refusing to continue the endorsement of the notes. The agreement to continue to endorse so long as the banks would renew was a valuable consideration for the promise to indemnify. On the other hand, the complainants' agreement, a year later, to relieve the defendant from endorsing renewals, their trouble and expense of raising the money at that time to take up the notes, was also a valuable consideration for his agreement to forego the indemnity. The defendant later obtaining the indemnity notes from the escrow was a fraud. The suit is a fraud. The defendant will be ordered to deliver up the notes, and the suit at law will be enjoined."

*Mr. Milton M. Unger,* for the appellant.

*Messrs. Zucker & Goldberg,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion delivered by Vice-Chancellor Backes in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 14.

*For reversal*—None.